IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| EVAN MIDDLETON,<br><br>    Plaintiff,<br> v.<br><br>ERIN REYES, CYNTHIA DIETER, MIKE REESE, WARREN ROBERTS, and JOE BUGHER,<br><br>    Defendants. | Case No.: 2:24-cv-00753-AN<br><br>OPINION AND ORDER |

    Self-represented plaintiff Evan Middleton brings this civil rights action against defendants Erin Reyes ("Reyes"), Cynthia Dieter ("Dieter"), Mike Reese ("Reese"), Dr. Warren Roberts ("Dr. Roberts"), and Joe Bugher ("Bugher"), all current or former officials at the Oregon Department of Corrections ("ODOC"). Specifically, plaintiff brings claims under 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments, based on allegations that defendants acted with deliberate indifference by withholding necessary medical care. Four summary judgment motions are pending before the Court: a motion for summary judgment filed by plaintiff, and three cross-motions for summary judgment filed by, respectively, (1) Bugher; (2) Dr. Roberts; and (3) Reyes, Dieter, and Reese (together, the "State defendants"). After reviewing the parties' filings, the Court finds that oral argument will not help resolve this matter. Local R. 7-1(d). For the reasons stated below, plaintiff's motion is DENIED. and defendants' motions are GRANTED.

## LEGAL STANDARD

    Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When cross-motions for summary judgment are filed, each party's evidence is considered, "regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). When deciding

1

a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. *See Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphases omitted). The substantive law determines which facts are material. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party has the initial burden of informing the court of the basis for its motion and identifying the portions of the pleadings and the record that it believes demonstrate the absence of an issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. *Id.* at 325. Instead, the moving party need only show that there is an absence of evidence to support the non-moving party's case. *Id.* If the moving party sustains its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. *Id.* at 324.

A party asserting that a fact is or is not genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed R. Civ. P. 56(c)(1)(A). Where the party opposing summary judgment is self-represented, the court "must consider as evidence . . . all of [that party's] contentions offered in motions and pleadings," so long as those "contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the party] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (collecting cases).

## BACKGROUND

**A.     Factual Background**

Plaintiff is an adult in custody ("AIC") at Two Rivers Correctional Institution ("TRCI"). Compl., ECF [2], at 5-6. On April 20, 2023, plaintiff sent TRCI Health Services an AIC Communication Form, referred to by plaintiff as a Non-Emergency Health Care Request ("kyte"), stating that he believed he had developed a hernia on his right side and that it felt "just like" the left-sided hernia he developed ten years prior. Exs. to Pl. Mot. Summ. J. ("Pl. Exs. Supp. Mot."), ECF [18-1], at 1 (Ex. 1) (references to ECF pagination of exhibits). The next day, a TRCI Health Services nurse responded: "You are signed up for sick call." *Id.* Plaintiff attended sick call on April 25, 2023, where he reported that the hernia had been "troublesome" for the past month. Decl. Cindy Dieter Supp. State Defs. Mot. Summ. J. ("Dieter Decl."), ECF [43], ¶ 7 & Ex. 101, at 1; Pl. Exs. Supp. Mot. 2 (Ex. 2).

On May 4, 2023, plaintiff saw his ODOC medical provider, Dr. Paul Vitt ("Dr. Vitt"). Dieter Decl. ¶ 8 & Ex. 101, at 1. The chart note from this visit indicates, in relevant part: "Right indirect inguinal hernia problematic with any maneuver that increases intra-abdominal pressure. Hernia spontaneously reduces without difficulties at this time. [Diagnosis]: Right inguinal hernia (indirect). Plan: Ultrasound of each." *Id.* (alteration in original). Plaintiff received the right-sided ultrasound about two weeks later, on May 16, 2023. *Id.* ¶ 10 & Ex. 101, at 4. The ultrasound report ("May 2023 Report"), signed by Dr. John Gambino ("Dr. Gambino"), indicates the presence of a 1.2-centimeter right inguinal hernia. Dieter Decl. ¶ 10 & Ex. 102, at 15.

On May 31, 2023, plaintiff sent a kyte stating: "I had a hernia for over [two] months and I was told that I would see my provider about getting surgery. When will I get surgery I NEED it. It hurts when I go to the bathroom." Pl. Exs. Supp. Mot. 3 (Ex. 3). On June 3, 2023, a TRCI Health Services nurse responded: "Chart review scheduled with provider. Ultrasound [first.]" *Id.* One week later, on June 6, 2023, plaintiff sent another kyte reiterating his need for hernia surgery. Pl. Exs. Supp. Mot. 4 (Ex. 4).

On June 7, 2023, Dr. Vitt performed a chart review and ordered a hernia follow-up to be scheduled in three months, "or sooner if the hernia became problematic or 'nonreducible.'" Dieter Decl. ¶ 11 & Ex. 101, at 5. That day, plaintiff also sent a kyte asking for the results of the May 16, 2023, ultrasound and again reiterating his pain. Pl. Exs. Supp. Mot. 5 (Ex. 5). On June 7, 2023, a TRCI Health

3

Services staff member responded to this kyte: "You are added to our schedule for your request." *Id.* Plaintiff submitted another kyte on June 9, and another on June 11, 2023. *Id.* at 6-7 (Exs. 6, 7). Also on June 9, 2023, a TRCI nurse responded to plaintiff's June 6, 2023, kyte, stating: "You were assessed today [June 9, 2023]. Chart review with provider on Monday." Pl. Exs. Supp. Mot. 4 (Ex. 4). On June 12, 2023, the TRCI Medical Services Manager, Dorothy Wettlaufer ("Wettlaufer"), responded to plaintiff's June 9, 2023, kyte, stating that plaintiff had been seen in medical on June 9, 2023, and that his provider would be reviewing his chart. *Id.* at 6 (Ex. 6). A TRCI Health Services staff member responded to plaintiff's June 11, 2023, kyte on June 12, 2023, stating: "You have a chart review today with the provider." *Id.* at 7 (Ex. 7).

On June 16, 2023, plaintiff sent a kyte accompanied by a handwritten letter which stated that he was "in pain all day" and inquired into the state of his case. *Id.* at 8-9 (Ex. 8). According to the kyte and letter, Dr. Vitt had told plaintiff "that he was going to get [plaintiff] surgery after the ultrasound" and that he was "going to take [plaintiff's case] to [ODOC's Therapeutic Level of Care ("TLC")] Committee[.]" *Id.* Plaintiff asked in the letter whether the TLC Committee was "now second guessing [Dr.Vitt's] work[.]" *Id.* at 9. In response, a TRCI Health Services staff member wrote: "Dr. Vitt's knowledge [and] suggestions are not in question. The TLC [Committee] uses a number of different criteria to decide the plan of care." *Id.* at 8. On June 21, 2023, plaintiff sent another kyte asking if he had been approved for hernia surgery. *Id.* at 10 (Ex. 9). The next day, a TRCI Health Services nurse responded: "It has not been presented to [the] TLC [Committee]. It appears you will be seen by a provider to further evaluate your hernia. Please be patient." *Id.*

Plaintiff attended a sick call visit on June 23, 2023. *Id.* at 11 (Ex. 10). Afterwards, a TRCI Health Services nurse wrote to plaintiff, in relevant part: "[P]rovider is aware of your concerns regarding the hernia and you are up to be scheduled to see him in the next month or so. Please be patient with the process. Increase your fiber, fluids, [and] movement to prevent constipation/straining in the meantime." *Id.* The next day, plaintiff sent two kytes and handwritten letters addressed to Wettlaufer and Dieter, respectively, "[r]egarding medical malpractice of [his] hernia and all the pain [he is] in." *Id.* at 12-21 (Ex.

4

11). Plaintiff wrote that the TLC Committee denied his surgery based on "made up" criteria and that on a scale of one to ten, he was experiencing "an [eight] in pain, throbbing pain, stomach pain." *Id.* at 14, 16 (Dieter letter), 21 (Wettlaufer letter). On June 27, 2023, Wettlaufer responded to both kytes. *Id.* at 12, 17. Wettlaufer provided a substantively identical response to each kyte, stating: "Dr. Vitt ordered an ultrasound, this was done on 5/16/23. He stated that you were not a surgical candidate at this time based on the results. Dr. Vitt is scheduled to review the recent nursing notes today." *Id.* at 20; *see id.* at 17.

On June 28, 2023, plaintiff filed a grievance, identified as grievance number TRCI-2023-07-006 (the "Grievance"), against Wettlaufer, complaining that Wettlaufer refused to schedule plaintiff for hernia surgery despite his worsening symptoms and medical need. Dieter Decl. ¶ 13 & Ex. 102, at 9; Pl. Exs. Supp. Mot. 22 (Ex. 12). Plaintiff wrote that the pain was "making it very difficult . . . to do basic things, like sleep, use the bathroom[,] and walk." Dieter Decl. Ex. 102, at 9; Pl. Exs. Supp. Mot. 22 (Ex. 12).

Two days later, on June 30, plaintiff sent TRCI Health Services a kyte asking to be placed in a bottom bunk until he received surgery. Dieter Decl. ¶ 14 & Ex. 101, at 7; Pl. Exs. Supp. Mot. 24 (Ex. 14). In response, a TRCI Health Services nurse wrote: "You are not scheduled for a surgery?" Dieter Decl. Ex. 101, at 7; Pl. Exs. Supp. Mot. 25 (Ex. 14). Plaintiff sent another kyte that day, again asking for a bottom bunk restriction until his hernia was fixed. Dieter Decl. ¶ 15 & Ex. 101, at 8; Pl. Exs. Supp. Mot. 24 (Ex. 13). In response, a TRCI Health Services nurse wrote, "You are not scheduled for hernia surgery. . . . I am not sure what you are asking[.] . . . Do you want sick call?" Dieter Decl. ¶ 15 & Ex. 101, at 8; Pl. Exs. Supp. Mot. 24 (Ex. 13).

On July 3, 2023, plaintiff sent a kyte stating: "I was diagnosed with having a hernia on 5-16-2023. I am currently on the [t]op bunk. Because I have a hernia [it] is hard to get on the [t]op bunk, [i]t HURTS. Currently the bottom bunk in my cell is open. C[an] you [make] it so I am bottom bunk restricted, at least until[] my hernia gets fix[ed]." Dieter Decl. ¶ 16 & Ex. 101, at 9 (capitalization in original). In response, a TRCI Health Services staff member wrote: "I am sorry but that does not fall into our bottom bunk restriction guidelines." *Id.* Plaintiff submitted another kyte on July 4, 2023, stating that he wanted

5

notes from his provider's previous chart reviews and that "medical is hiding these notes from [him]." Pl. Exs. Supp. Mot. 26 (Ex. 15). On July 5, 2023, a TRCI Health Services staff member responded: "We will add you to our schedule and look into this." *Id.*

Approximately one week later, on July 10, 2023, Dr. Vitt saw plaintiff for a follow-up appointment. Dieter Decl. ¶ 20 & Ex. 101, at 10. He examined plaintiff and ordered a follow-up right inguinal ultrasound to compare against the May 2023 Report. *Id.* ¶ 21 & Ex. 101, at 11. Dr. Vitt's chart note from this visit states:

> "[I]nguinal canal [right] side becoming more symptomatic[.] No longer reducible for past month[.] [D]ifficulties[.] Hernia much larger than previously seen. Unable to report to work today due to pain from attempting to reduce. Presently this afternoon[] pain [decreased] but still present. Exam[:] 4 cm. inguinal hernia (direct) reducible but quite uncomfortable to reduce. Pictures taken [with] AIC consent for presentation to TLC [Committee] for surgical evaluation. [Diagnosis] large [right] inguinal direct hernia. Plan: To TLC [Committee] for consideration of surgical consult."

*Id.* ¶ 20 & Ex. 101, at 10. After the appointment, plaintiff sent a kyte and handwritten letter explaining Dr. Vitt's findings and asking why Wettlaufer was "undermining [Dr.] Vitt's orders." Pl. Exs. Supp. Mot. 28-30 (Ex. 16). The same day, TRCI Health Services Nurse R. Owens ("Owens") responded: "[Y]ou were seen by Dr. Vitt on 7/10/23[.] Surgery request[s] have to be approved by [the] TLC [Committee]. This should be happening soon. Please let nursing staff know if things worsen. Currently per notes the hernia is reducible[.]" *Id.*

Plaintiff saw Owens the next day. Dieter Decl. ¶ 22. Owens's chart note states:

> "AIC to medical regarding kyte sent 7/10/23. AIC [complaining of] ongoing frustration and pain [related to] inguinal hernia. AIC states yesterday he was getting off his bunk and pulled the muscles near the hernia. AIC advised that he saw Dr. Vitt yesterday, he will discuss a surgical consult with [the] TLC [Committee]. AIC was advised and educated that while the hernia is still reducible that it is not a surgical emergency. AIC educated on abdominal precautions, and when to contact nursing staff—not reducible, extreme pain, nausea/vomit, etc. AIC States understanding and agrees with plan."

*Id.* ¶ 22 & Ex. 101, at 12.

On July 12, 2023, plaintiff sent Owens a kyte stating: "Thank you for taking time out of your busy day to speak to me. Please don[']t forget to make me bottom bunk restrictive the only reason why I am reminding you is because I am still on the top bunk. Once again[, t]hank you for talking to me."

6

*Id.* ¶ 23 & Ex. 101, at 13. On July 13, 2023, Dieter responded: "It is in the computer through 7/26/23." *Id.* On July 15, 2023, plaintiff was moved to a bottom bunk. *Id.* ¶ 26 & Ex. 104, at 2.

Plaintiff received a second ultrasound on July 18, 2023. *Id.* ¶ 28 & Ex. 101, at 15-16. The ultrasound report ("July 2023 Report"), again signed by Dr. Gambino, found a 2.2 cm right-sided hernia that was protruding into the inguinal canal. *Id.* at Ex. 101, at 15-16. Under "Findings," Dr. Gambino mistakenly wrote that the hernia previously measured at "*approximately 1.9 cm*." *Id.* (emphasis added). Under "Impression," he wrote: "Fat containing right inguinal hernia not significantly changed in size from the prior study." *Id.* In reality, the May 2023 Report showed a hernia measuring 1.2 cm. *Id.* ¶ 10 & Ex. 102, at 15. The July 2023 Report therefore overstates the May 2023 Report's findings by 0.7 cm. *Id.* ¶ 28.

On July 25, 2023, Dieter responded to plaintiff's Grievance (the "Grievance Response"), stating: "I have read your grievance in which you state that . . . Wettlaufer[] is refusing to allow you to have hernia repair surgery. A review of your health care record indicates that you had a repeat ultrasound on July 18, 2023. Mr. [Patrick] Maney, [Nurse Practitioner ("Maney")] is scheduled to review this and then develop a plan of care." *Id.* ¶ 30 & Ex. 102, at 8; Pl. Exs. Supp. Mot. 23 (Ex. 12). Maney reviewed the July 2023 Report that day. *Id.* ¶ 29 & Ex. 101, at 17. He commented that the hernia had "not significantly changed in size from prior study" and told plaintiff to report to sick call if needed or to send a kyte if he had questions. *Id.* ¶ 29 & Ex. 101, at 17.

Plaintiff appealed the Grievance Response on July 30, 2023 (the "Grievance Appeal"), stating that Wettlaufer, Maney, and Dieter were "undermin[ing] the plan of care created by Dr. [] Vitt" and that they were "waiting for [his] [h]ernia to manifest [into] a life threatening emergency before providing surgery." Dieter Decl. ¶ 32 & Ex. 102, at 6-7; Pl. Exs. Supp. Mot. 33-34 (Ex. 18). Plaintiff requested that they "[f]ollow Dr. Vitt['s] plan of care for [h]ernia repair surgery as soon as possible and treat comorbidities arising from [the] need for [h]ernia repair to minimize risk of permanent harm[.]" Dieter Decl. Ex. 102, at 6-7; Pl. Exs. Supp. Mot. 33-34 (Ex. 18).

On August 3, 2023, plaintiff sent a kyte "regarding the serious medical concern of the inaccuracy of the 7-18-2023 ultrasound and how TRCI lied and misled the TLC regarding [plaintiff]

7

needing surgery on [his] hernia." Pl. Exs. Supp. Mot. 36-37 (Ex. 19). In the letter, plaintiff identified the error in the July 2023 Report and wrote that the May 2023 Report showed that the hernia was 1.2 centimeters, not 1.9 centimeters as reflected in the July 2023 Report. *Id.* In response, Wettlaufer wrote: "I see what you're saying about the previous size in the two reports. This will be brought up with the provider." *Id.*

On August 7, 2023, plaintiff was transferred to a new cell and assigned a top bunk. Dieter Decl. ¶ 26 & Ex. 104, at 2. Following this transfer, plaintiff did not submit any additional kytes regarding his bunk assignment. *Id.* ¶ 27.

On August 16, 2023, the TRCI Grievance Office accepted plaintiff's Grievance Appeal. Dieter Decl. ¶ 32 & Ex. 102, at 6-7; Pl. Exs. Supp. Mot. 33-34 (Ex. 18). On August 23, 2023, Dr. Roberts responded to plaintiff's Grievance Appeal (the "Grievance Appeal Response"), stating that the July 2023 Report showed that the hernia had not significantly changed, that no request for hernia surgery had yet been presented to the TLC Committee, and that ODOC would schedule plaintiff for a follow-up appointment "with a provider to discuss [his] plan of care and the next steps." Dieter Decl. ¶ 33 & Ex. 102, at 5; Pl. Exs. Supp. Mot. 35 (Ex. 18). The Grievance Appeal Response repeated the "Impression" statement found in the July 2023 Report, stating that the ultrasound "showed a fat containing right inguinal hernia [that] had not significantly changed in size from the prior study." Dieter Decl. Ex. 102, at 5; Pl. Exs. Supp. Mot. 35 (Ex. 18). On August 30, 2023, plaintiff submitted a final grievance appeal (the "Final Grievance Appeal") noting the error in the July 2023 Report and the Grievance Appeal Response's reliance on that error. Dieter Decl. ¶ 34 & Ex. 101, at 22-24; Pl. Exs. Supp. Mot. 38-40 (Ex. 20).

On September 5, 2023, plaintiff saw ODOC medical provider Dr. Thomas Bristol ("Dr. Bristol"). Dieter Decl. ¶ 35. After examining plaintiff, Dr. Bristol referred plaintiff's case to the TLC Committee for hernia repair surgery. *Id.* ¶ 35 & Ex. 101, at 25. The TLC Committee approved the request that day and set plaintiff's hernia repair for consultation with an outside medical provider. *Id.* ¶ 36 & Ex. 101, at 11, 25-26; Pl. Exs. Supp. Mot. 43 (Ex. 21). Dr. Bristol then submitted an order asking the TRCI Health Services schedulers to set a consultation appointment with a medical provider who could perform

the hernia procedure.  Dieter Decl. ¶ 36.

Three weeks later, on September 26, 2023, plaintiff sent a kyte stating that Dr. Bristol informed him that the TLC Committee approved his surgery on September 5, 2023, and asking why his surgery had not been scheduled.  Pl. Exs. Supp. Mot. 44 (Ex. 22).  Dieter responded a few days later: "Yes this has been approved [and] is currently waiting for an open appointment." *Id.*

On September 27, 2023, Bugher responded to plaintiff's Final Grievance Appeal.  Dieter Decl. ¶ 37 & Ex. 101, at 27; Pl. Exs. Supp. Mot. 45 (Ex. 23).  Bugher acknowledged the discrepancy in the ultrasound reports and explained that the discrepancy "was brought to the attention of the providers," and then wrote that the TLC Committee had approved the hernia repair surgery, which was "currently being scheduled."  Dieter Decl. ¶ 37 & Ex. 101, at 27; Pl. Exs. Supp. Mot. 45 (Ex. 23).

On October 2, 2023, having not yet received his surgery, plaintiff sent another kyte.  Dieter Decl. Ex. 101, at 28; Pl. Exs. Supp. Mot. 46 (Ex. 24).  In response, a TRCI Health Services nurse wrote: "This was approved by [the TLC Committee] on 9-5-23 [and] is pending scheduling.  You are not our only patient awaiting surgery.  Please be patient.  If your symptoms have changed or worsened please let us know."  Dieter Decl. Ex. 101, at 28; Pl. Exs. Supp. Mot. 46 (Ex. 24).

That same day, plaintiff sent a tort claim notice to the Oregon Department of Administrative Services stating that TRCI Health Services staff had acted with deliberate indifference and unnecessarily delayed his hernia repair surgery.  Pl. Exs. Supp. Mot. 58-62 (Ex. 33).  Plaintiff wrote that TRCI Health Services staff interfered with his medical treatment by "[f]alsi[f]ying medical documents; (deliberately) loosing [*sic*] TLC review forms; misrepresenting the seriousness of [his] [h]ernia and Dr. Vitt's diagnosis and or his plan of care (surgery) when responding to kytes and grievances." *Id.* at 61.  On November 14, 2023, the Custody Claims Unit of the Oregon Department of Administrative Services denied his claim, stating that "[t]he record does not substantiate [plaintiff's] allegations of unnecessary delays in medical care." *Id.* at 58.

One month later, on December 17, 2023, plaintiff sent a kyte asking why he had not yet been scheduled for hernia surgery despite Dr. Bristol's approval more than three months prior.  Dieter Decl.

9

Ex. 101, at 29; Pl. Exs. Supp. Mot. 47 (Ex. 25). On December 19, 2023, a TRCI staff member responded: "You will be scheduled soon." Dieter Decl. Ex. 101, at 29; Pl. Exs. Supp. Mot. 47 (Ex. 25). Plaintiff followed up again the next month and asked if TRCI Health Services was intentionally delaying his surgery. Dieter Decl. Ex. 101, at 30; Pl. Exs. Supp. Mot. 48 (Ex. 26). In response, a TRCI Health Services nurse wrote: "Takes time, you are not the only person waiting for an outside [appointment]." Dieter Decl. Ex. 101, at 30; Pl. Exs. Supp. Mot. Ex. 26. On February 14, 2024, plaintiff followed up again, asking why he had not been scheduled for hernia surgery despite waiting nine months. Dieter Decl. Ex. 101, at 31; Pl. Exs. Supp. Mot. 49 (Ex. 27). A TRCI Health Services nurse responded: "I will check with our scheduler. These [appointments] can take time. The outside facility is the one that calls us to schedule an [appointment]. Order has been sent (9/2023)." Dieter Decl. Ex. 101, at 31; Pl. Exs. Supp. Mot. 49 (Ex. 27). On February 20, 2024, plaintiff sent a kyte following up on whether Health Services had checked with the scheduler. Dieter Decl. Ex. 101, at 32; Pl. Exs. Supp. Mot. 50 (Ex. 28). In response, a TRCI Health Services nurse wrote: "I was informed by our schedulers that you'd be scheduled soon. Not yet scheduled." Dieter Decl. Ex. 101, at 32; Pl. Exs. Supp. Mot. 50 (Ex. 28).

Plaintiff sent another kyte on March 6, 2024, again asking if he had been scheduled for hernia surgery. Dieter Decl. Ex. 101, at 33; Pl. Exs. Supp. Mot. 51 (Ex. 29). In response, a TRCI Health Services nurse wrote: "Not yet scheduled." Dieter Decl. Ex. 101, at 33; Pl. Exs. Supp. Mot. 51 (Ex. 29). On March 10, 2024, plaintiff sent a kyte again asking why he had not been scheduled for hernia surgery and asking for an explanation as to why it was taking so long to schedule his surgery. Dieter Decl. Ex. 101, at 34; Pl. Exs. Supp. Mot. 52 (Ex. 30). A TRCI Health Services nurse responded: "You have a consult coming soon regarding hernia. We have no control of outside scheduling availability." Dieter Decl. Ex. 101, at 34; Pl. Exs. Supp. Mot. 52 (Ex. 30). Plaintiff followed up again on March 13, 2024, writing that he was confused as to why TRCI Health Services was "passively waiting" for an outside provider to schedule his surgery when doctors had told him he needed the surgery for many months. Dieter Decl. Ex. 101, at 35; Pl. Exs. Supp. Mot. 53 (Ex. 31). On March 14, 2024, a TRCI Health Services nurse responded: "You are scheduled [with] a provider outside for a consultation which is a standard thing to complete before a

surgical procedure is completed." Dieter Decl. Ex. 101, at 35; Pl. Exs. Supp. Mot. 53 (Ex. 31).

On March 18, 2024, plaintiff informed security personnel at ODOC that he was experiencing severe right-sided groin pain after going down the stairs from his bunk. *Id.* ¶ 49 & Ex. 101, at 14. Plaintiff was seen by TRCI Health Services, where he reported experiencing ten out of ten right-sided pain. *Id.* at Ex. 101, at 14. TRCI Health Services wrote that plaintiff had a "visible hernia along right inner groin, distended, firm and skin over hernia grayish dusky appearance. A need for higher level of care." *Id.* Plaintiff was then sent by ambulance to Good Shepherd Hospital. *Id.* ¶ 49 & Ex. 101, at 14. He received a CT scan the next day that showed evidence of a partial or developing obstruction in plaintiff's small bowel. *Id.* ¶ 50; Pl. Exs. Supp. Mot. 56 (Ex. 32). Specifically, the CT report found a "[l]arge right inguinal hernia which contains cecum/appendix and small bowel [and a] mild dilation of the terminal ileum proximal to the hernia[ which] could relate to partial/developing obstruction." Pl. Exs. Supp. Mot. 56 (Ex. 32). Plaintiff underwent an incarcerated inguinal hernia repair surgery that day. Dieter Decl. ¶ 50 & Ex. 101, at 36-37; Pl. Exs. Supp. Mot. 54-55 (Ex. 32).

After the surgery, plaintiff returned to TRCI, where he saw a TRCI Health Services nurse on March 19, 2024. Dieter Decl. ¶ 51. The chart note from this visit states:

> "[Patient] returned from outside med[ical] trip. Reports he is doing much better. [Patient] states 'I feel like a new man.' [Patient] denies any pain at this time. Ambulates to exam table [with] steady gait. . . . [Patient] has two laparoscopic surgical wounds [with] edges well approximated. [Patient] given a copy of the discharge instructions. Reports he wants to resume work as he does light duty work in the laundry. [Patient] agreed to notify medical if activity too much. Orders to resume light duty activity. Discussed [with] provider."

*Id.* at Ex. 101, at 14.

Since coming into ODOC custody, until October 2024, the only grievance plaintiff filed related to medical care was the Grievance. Decl. Arnell Eynon Supp. State Defs. Mot. Summ. J. ("Eynon Decl."), ECF [44], ¶ 20. At no point in the Grievance or his appeals of the Grievance did plaintiff state his request that he be placed on bottom bunk restriction. *Id.* ¶ 20 & Ex. 105. Plaintiff did not file any grievances related to his bunk assignment. *Id.* ¶ 20 & Ex. 105.

**B.    ODOC Policies**

11

1. *Bottom Bunk Restrictions*

TRCI Health Services has a procedure for handling medically necessary bottom bunk restrictions. Dieter Decl. ¶ 17. First, AICs must request bunk restrictions during a scheduled medical appointment or sick call. *See id.* ¶ 18. TRCI nurses who see patients at sick call are permitted to enter temporary bunk and stair restriction orders for AICs experiencing medical symptoms. *Id.* ¶ 19. For long-term restrictions, AICs must see an ODOC medical provider. *See id.* ¶ 18. If an ODOC medical provider determines that a bunk restriction is needed, TRCI Health Services notifies the AIC's Unit Officer, and TRCI Security Officers then change the AIC's bunk status to allow the AIC to move bunks. *Id.* Bottom bunks are often reserved for elderly AICs or AICs with medical equipment, physical disabilities, or other limitations that necessitate a bottom bunk for their ease or safety. *Id.* ¶ 17 & Ex. 103.

2. *Outside Appointment Scheduling*

From March 2023 to April 2024, there was "a large statewide backlog of outside medical appointments[.]" *Id.* ¶ 47. During that time, Dieter was not involved in scheduling outside medical appointments. *Id.* ¶ 46. Outside appointments were handled by ODOC schedulers who worked for ODOC Health Services. *Id.* These schedulers were supervised by the TRCI Health Services' office manager. *Id.* As a nurse manager, Dieter did not supervise or have oversight over how outside appointment scheduling was conducted. *Id.*

3. *Grievance System*

Within ODOC, AIC grievances are processed in accordance with Chapter 291 of the Oregon Administrative Rules. Eynon Decl. ¶ 6. AICs are generally encouraged to communicate with line staff verbally or in writing as a primary means of resolving disputes but may file a grievance if these approaches do not resolve the issue. *Id.* ¶ 7 (citing Or. Admin. R. 291-109-0100(3)(a), (b)). An AIC may grieve, in relevant part, the misapplication of any departmental policies, rules, or other directives; unprofessional actions of ODOC employees; and inadequate medical treatment. *Id.* ¶ 9 (citing Or. Admin. R. 291-109-0210(3)(a)-(c)).

A grievance must be received by the grievance coordinator within fourteen calendar days

of the incident giving rise to the grievance. *Id.* ¶ 10 (citing Or. Admin. R. 291-109-0205(1)). When a grievance is accepted, ODOC staff provide an initial response to the AIC within thirty-five days unless further investigation is needed. *Id.* ¶ 12 (citing Or. Admin. R. 291-109-0205(2)). When a grievance is denied for not complying with applicable rules, it is returned to the AIC with an explanation. *Id.* ¶ 13.

If an AIC is not satisfied with the grievance response, they may appeal through a two-level system of review. *Id.* ¶ 14. The first level of appeal is referred to a functional unit manager. *Id.* ¶ 15. The grievance coordinator must receive a first-level grievance appeal within fourteen calendar days from the date that the grievance coordinator sent the grievance response to the AIC. *Id.* (citing Or. Admin. R. 291-109-0205(3)). If an AIC is not satisfied with the response to their first-level grievance appeal, they may submit a second appeal within fourteen calendar days from the date the grievance coordinator sent the first-level appeal response. *Id.* ¶ 16 (citing Or. Admin. R. 291-191-0205(5)). An assistant director having authority to resolve the issue conducts the second level of appeal. *Id.* ¶ 17. The assistant director's decision on an AIC's grievance appeal is final and not subject to further administrative review. *Id.* (citing Or. Admin. R. 291-191-0235(5)).

### C.    Procedural Background

Plaintiff initiated this case on May 2, 2024. The case caption names five defendants: (1) "Erin Reyes- Superintendent, TRCI"; (2) "C. Deiter- Health Services Director at TRCI"; (3) "Mike Reese- Director of ODOC"; (4) "Roberts Warren- Medical Director, ODOC"; and (5) "J. Bugher- Assistant Director Health Services, ODOC." Compl. 1. In the "Parties" section, plaintiff ticked a box stating "Official Capacity" for each defendant, and did not tick any of the "Individual Capacity" boxes. *Id.* at 2-3. For "Relief," plaintiff wrote: "For the deliberately indifferent to [p]laintiff [*sic*] pain and suffering, [p]laintiff request[s] money damages of $1,000,000." *Id.* at 7.

Plaintiff filed a motion for summary judgment on November 26, 2024. Pl. Mot. Summ. J. ("Pl. Mot.."), ECF [18]. Bugher filed a combined cross-motion for summary judgment and opposition to plaintiff's motion on May 29, 2025. Bugher Cross-Mot. Summ. J. & Resp. Opp'n Pl. Mot. ("Bugher Cross-Mot. & Resp."), ECF [37]. Dr. Roberts filed a combined cross-motion for summary judgment and

13

opposition to plaintiff's motion on June 2, 2025. Dr. Roberts Cross-Mot. Summ. J. & Resp. Opp'n Pl. Mot. ("Dr. Roberts Cross-Mot. & Resp."), ECF [39]. The State defendants filed a cross-motion for summary judgment, State Defs. Cross-Mot. Summ. J. ("State Defs. Cross-Mot."), ECF [42], and separately, a response in opposition to plaintiff's motion, State Defs. Resp. Opp'n Pl. Mot. ("State Defs. Resp."), ECF [41]. On June 27, 2025, plaintiff filed a response in opposition to Dr. Roberts' cross-motion, to which he attached a Fact Finding Report by the ODOC, dated December 17, 2024, which discusses Dr. Roberts and Bugher. Dr. Roberts filed a reply in support of his cross-motion on July 3, 2025. Dr. Roberts Reply Supp. Cross-Mot. & Resp. ("Dr. Roberts Reply"), ECF [49]. On August 25, 2025, plaintiff filed a reply in support of his motion. Pl. Reply Supp. Mot. ("Pl. Reply"), ECF [52].

## DISCUSSION

Plaintiff and defendants each argue that they should be granted summary judgment in this action. Plaintiff argues that defendants were deliberately indifferent to his serious medical needs. Defendants argue that plaintiff's claims fail as a matter of law because there is no evidence that any defendant personally participated in depriving plaintiff of any constitutional right. Secondarily, defendants argue that they are each entitled to qualified immunity. The State defendants additionally argue that any claims brought on the basis of bunk assignment fail because plaintiff did not exhaust all available remedies as to that issue.

**A.    Defendant Capacity**

As a preliminary matter, the Court construes this action as an individual capacity suit. State employees may be sued in their individual capacity or in their official capacity. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165-68 (1985). Individual capacity suits seek to hold the named government official personally liable for actions that individual took under color of law. *Id.* at 166. Official capacity suits, by contrast, "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Id.* at 165-66 (quoting *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 568, 690 & n.55 (1978)). When a state employee is sued in their official capacity, the "suit is, in all respects other than name, to be treated as a suit against the [state]." *Id.* at 166.

To determine whether an action is an individual or official capacity suit, courts look to "the case's caption, statements [made] in [pleadings] and other [filed] papers, and statements made in court." *Doe By & Through Doe v. Petaluma City Sch. Dist.*, 830 F. Supp. 1560, 1577 (N.D. Cal. 1993) (citing *California v. Harvier*, 700 F.2d 1217 (9th Cir. 1983)).  When "state officials are named in a complaint which seeks damages under 42 U.S.C. § 1983, it is presumed that the officials are being sued in their individual capacities." *Shoshone-Bannock Tribes v. Fish & Game Comm'n, Idaho*, 42 F.3d 1278, 1284 (9th Cir. 1994).  This is because actions for monetary damages cannot be brought against state employees in their official capacity under section 1983.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under [section] 1983.").  States are generally entitled to immunity in a federal court under the Eleventh Amendment.  *See Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 617 (2002).  Accordingly, section 1983 actions that seek monetary damages may only survive when they are brought against state officials in their individual capacity.

Here, as noted, the complaint lists the parties as being sued in their official capacities.  Little else in the record offers much guidance.  The caption is ambiguous, providing both the individuals' names and titles, and the complaint does not specify whether damages are sought from the individual officials or from the state itself.

Nonetheless, the course of proceedings suggests that this may in fact be an individual capacity suit.  First and foremost, it would be illogical to interpret this as an official capacity action because all the asserted claims would be barred by immunity.  *See Brown v. Oregon Dep't of Corr.*, 751 F.3d 983, 989 (9th Cir. 2014) ("[C]laims against [ODOC] and [] damages claims against the individual defendants[, prison officials,] in their official capacities are barred by the Eleventh Amendment.").  Second, none of the defendants raised the Eleventh Amendment in their briefing.  In fact, each defendant raised a qualified immunity defense, which is only available in individual capacity suits.  *See Wright v. Beck*, 981 F.3d 719, 737 (9th Cir. 2020) (quoting *Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 965 (9th Cir. 2010)) ("Qualified immunity is, however, 'available only to government officials sued in their individual capacities'

and is 'not available to those sued only in their official capacities.'"). Finally, the complaint "must be held to 'less stringent standards than formal pleadings drafted by lawyers'" because plaintiff is self-represented. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (citation omitted). Recognizing the ambiguity and need for leniency, the Court assesses the complaint as the parties have, as an individual capacity action.

B.      **Administrative Exhaustion**

To the extent that plaintiff brings any claims with respect to his bunk assignment, those claims must be dismissed for failure to exhaust under the Prison Litigation Reform Act ("PLRA"). The PLRA provides that an AIC must exhaust all available remedies prior to filing a lawsuit with respect to prison conditions under section 1983 or any other federal law. 42 U.S.C. § 1997e(a); *see Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion requires compliance "with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88, 90-91 (2006). This includes pursuing a grievance through the highest level of appeal. *See id.* at 90-91; *see also Bennett v. King*, 293 F.3d 1096, 1098 (9th Cir. 2002).

Failure to exhaust under the PLRA "is an affirmative defense" that "the defendant must plead and prove." *Jones v. Bock*, 549 U.S. 199, 204, 211-12, 216 (2007). The defendant has the initial "burden [] to prove that there was an available administrative remedy, and that the [AIC] did not exhaust that available remedy." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc). The burden then shifts to the plaintiff "to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.*

Here, the State defendants have shown that the ODOC grievance system was an available administrative remedy, and that plaintiff failed to exhaust that remedy because he never filed a grievance regarding his bunk assignment. Plaintiff does not offer any evidence to show that this remedy was effectively unavailable to him. Summary judgment is therefore appropriate as to any claims regarding plaintiff's bunk assignment.

C.      **Section 1983 Liability**

1.      *Eighth Amendment Claims*

16

Turning to the merits of plaintiff's constitutional claims, first, plaintiff has not shown that any defendant personally participated in violating his Eighth Amendment rights. Deliberate indifference to an AIC's serious medical needs can constitute an Eighth Amendment claim under section 1983. *Estelle*, 429 U.S. at 105. "An inadvertent failure to provide adequate medical care," however, does not meet this standard. *Id.* at 105-06. Instead, deliberate indifference may "appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (citing *Estelle*, 429 U.S. at 104-05). Prison officials act with deliberate indifference when they are aware that an AIC "face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Liability for such a violation "arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). A supervisor may be liable for such indifference if (1) the supervisor had "'personal involvement in the constitutional deprivation,'" or (2) there is "'a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).

Plaintiff argues that defendants acted with deliberate indifference in violation of the Eighth Amendment by refusing to follow medical orders and delaying plaintiff's hernia repair surgery. There can be no doubt that what plaintiff endured was painful and long. However, the evidence does not show that any defendant personally participated in disregarding plaintiff's serious medical needs.

***Bugher.*** Bugher's only involvement is his September 27, 2023, response to plaintiff's Final Grievance Appeal, in which Bugher acknowledged the discrepancy in the hernia measurements in the May 2023 Report and July 2023 Report and stated that plaintiff's hernia repair surgery was approved for scheduling. Dieter Decl. ¶ 37 & Ex. 101, at 27. Nothing in the record shows that Bugher personally participated in delaying or withholding medical care from plaintiff. Rather, Bugher's only involvement appears to have helped plaintiff receive the surgery he needed.

***Dr. Roberts.*** Dr. Roberts' only involvement is his August 23, 2023, response to plaintiff's

Grievance Appeal, in which Dr. Roberts stated that the July 2023 Report showed that the hernia had not significantly changed, and that plaintiff was scheduled for a follow up appointment with his provider to discuss his plan of care and next steps. Dieter Decl. ¶ 33 & Ex. 102, at 5. Denial of a medical grievance can constitute personal participation in certain circumstances. *See Colwell v. Bannister*, 763 F.3d 1060, 1068 (9th Cir. 2014). For example, in *Colwell*, the medical director for the Nevada Department of Corrections denied several grievances regarding an AIC's need for cataract surgery. *Id.* at 1064-65. Three medical providers had recommended that the AIC in *Colwell* receive cataract treatment. *Id.* at 1064. The medical panel denied the providers' multiple requests for surgery, after which the AIC filed several written grievances. *Id.* In the grievances, the AIC wrote that his provider's surgery request had been discontinued because the department was following a "'one eye only'" policy and the AIC had "one 'good' eye." *Id.* at 1065. The medical director reviewed the grievance history and wrote in a grievance response that the AIC "'should be evaluated periodically to determine degree of impairment cause by [the] cataract" but that in most cases "'cataract surgery is not an emergency.'" *Id.* at 1065. However, the medical director "was aware that an optometrist had recommended surgery and that [the AIC's] lower-level grievances had been denied despite that recommendation." *Id.* at 1070. Reasoning that a jury could find that the medical director "contributed to the decision to refuse treatment in conscious disregard of an excessive risk" to the AIC's health "pursuant to a policy rather than a considered medical judgment," the Ninth Circuit reversed the district court's grant of summary judgment in favor of the defendants and remanded the case for further proceedings. *Id.*

Here, there is no evidence that Dr. Roberts' Grievance Appeal Response contributed to a refusal to treat plaintiff in conscious disregard of excessive risk or that Dr. Roberts chose policy over medical judgment. Dr. Roberts' response did not prevent plaintiff from getting care, but rather, notified plaintiff that he had been scheduled for a follow up with his provider. That follow-up appointment occurred two weeks later, after which the provider referred plaintiff's case to the TLC Committee and the TLC Committee approved plaintiff's surgery. *See id.* ¶ 36 & Ex. 101, at 11, 25-26; Pl. Exs. Supp. Mot. 43 (Ex. 21). Dr. Roberts' response does repeat the July 2023 Report's error about the change in hernia size, but

there is no evidence that this contributed to a delay or denial of care. By the time of Roberts' response, the error had already been identified and was being addressed by TRCI Health Services. *See* Pl. Exs. Supp. Mot. 36 (Ex. 19). The evidence therefore does not show any genuine question of material dispute as to whether Dr. Roberts personally deprived plaintiff of medical care or caused plaintiff to experience such a deprivation.[1]

***Dieter.*** Dieter's only involvement in the events at issue is her (1) response to plaintiff's Grievance, dated July 25, 2023, stating that plaintiff had a repeat ultrasound and that a nurse would review the ultrasound and develop a plan of care; and (2) response to plaintiff's July 26, 2023, kyte, stating that his hernia repair surgery had been approved and was awaiting scheduling. *See* Dieter Decl. ¶¶ 26, 30 & Ex. 104, at 2; Pl. Exs. Supp. Mot. 23 (Ex. 12). Neither of these responses contributed to plaintiff's deprivation of medical care.

***Reyes and Reese.*** Finally, nothing in the record shows any actions taken by either Reese or Reyes.

As such, even taking the evidence in the light most favorable to plaintiff, nothing in the record indicates that Bugher, Dr. Roberts, or the State defendants were personally involved in depriving plaintiff of medical care. Accordingly, there is no genuine dispute of material fact as to whether defendants acted with deliberated indifference to plaintiff's serious medical needs, and summary judgment is appropriately granted in favor of defendants.

2. *Fourteenth Amendment Claims*

Plaintiff's Fourteenth Amendment claims must be dismissed pursuant to the "more-specific-provision rule." *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998). Under the more-specific-provision rule, "'[w]here a particular Amendment provides an explicit textual source of

---

[1] Plaintiff attaches a Fact Finding Report dated December 17, 2024, to his response in opposition to Dr. Roberts' motion. *See* Pl. Resp. Opp'n Dr. Roberts' Cross-MSJ & Resp., [ECF 46], at 6-89. The report "review[s] allegations" concerning Dr. Roberts and Bugher, specifically regarding their purported "retaliation" against an unknown person's advocacy for treating AICs "according to the standard of care." *See id.* This document does not help establish whether Dr. Roberts or Bugher acted with deliberate indifference towards plaintiff's serious medical needs.

constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Id.* at 842 (citation omitted). Therefore, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Id.* at 843.

As stated above, plaintiff's claims of deliberate indifference to his serious medical needs fall within the purview of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Estelle*, 429 U.S. at 104 (holding that deliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment). Accordingly, the Fourteenth Amendment claims must give way to the more specific Eighth Amendment here. Plaintiff's Fourteenth Amendment claims are therefore dismissed.

**D.    Qualified Immunity**

Because the record does not show that defendants deprived plaintiff of a constitutional right, the Court does not reach the remainder of the qualified immunity analysis. *See Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020).

## CONCLUSION

Plaintiff's Motion for Summary Judgment, ECF [18], is DENIED. Defendants' cross-motions for summary judgment, including Bugher's Cross-Motion for Summary Judgment, ECF [37]; Dr. Roberts's Cross-Motion for Summary Judgment, ECF [39]; and the State defendants' Cross-Motion for Summary Judgment, ECF [42], are GRANTED. This case is dismissed, and judgment shall follow.

IT IS SO ORDERED.

DATED this 29th day of September, 2025.

_____
Adrienne Nelson
United States District Judge